THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* EVARISTO LUGO, Defendant and Appellant.

No. 12196.   Argued March 25, 1948.—Decided June 25, 1948.

*Esteban Susoni Lens* for appellant.   *Luis Negrón Fernández, Attorney General,* and *J. Rivera Barreras, Prosecuting Attorney,* for appellee.

MR. JUSTICE DE JESÚS delivered the opinion of the Court.

Appellant was accused of assault to commit rape, but the jury found him guilty of aggravated assault and battery

and was sentenced to ninety days in jail. The only error assigned in support of this appeal is that the verdict is contrary to the evidence. We must, therefore, examine the evidence.

The star witness is, naturally, the prosecutrix. She testified that on or before June 11, 1944 she was working as a graduate nurse in the District Hospital of Arecibo; that on that day at about 2:30 in the afternoon her sister was leaving for New York; that she wanted to say good-bye to her sister and for that reason left Arecibo at noon in a public automobile; that on reaching Vega Alta she left the car in which she was travelling and took defendant's because the former was not running at the necessary speed to reach the airport in time; that on arriving at the entrance of the airport she told the defendant that she was returning by train, but he told her that he could wait for her because he was returning to Arecibo early and they agreed that he would come for her at the gate of the airport; that around three o'clock in the afternoon she was at the appointed place and boarded the automobile; that they drove towards Stop 15 in Santurce where other passengers took the same car and immediately left for Arecibo; that the other passengers got off at Fort Buchanan and from there on she traveled alone with the defendant until the first traffic light at the entrance of Bayamón where he took a passenger and later in Vega Alta other passengers boarded the car; that they remained there more than ten minutes because the passengers went out to purchase some things and the defendant brought her a sandwich and a can of pears; that from Vega Alta to Arecibo she was always accompanied by some passengers; that they did not stop at Vega Baja nor at Manatí; that they reached Arecibo about seven in the evening,[1] when it was al-

[1] On direct examination the prosecutrix did not testify that she had been to the movies with the defendant. On cross examination the defense repeatedly asked her whether she had been anywhere else in San Juan before leaving Stop 15 and only after showing her that the delay of four hours in going from San Juan to Arecibo was incredible and specifically

ready dark; that the other passengers alighted from the car in Arecibo and she continued alone in the front seat; that she asked the defendant to take her to the nurse's house in the District Hospital; that he assented and started in that direction but she noticed that the defendant took the Camuy road whereupon she asked him to go back and leave her in the hospital; that he told her that he was going to turn further up and without listening to her demands he reached the crossing near Hatillo; that he stopped the car and she

asking her if she had been to any movies before leaving for Arecibo, did the prosecutrix admit it as revealed by the following passages in the transcript of the evidence:

"Q.—After you came from the airport did you not go to the movies? A.—Well, I shall tell you, I went to the movies. Q.—To what movies?. A.—I shall tell you. Q.—To what movies did you go? A.—To the movies there. Q.—Was it the Liberty? A.—I do not know if it was the Liberty. Q.—Where was it? A.—Where the cars for Arecibo are parked, Stop 15. Q.—How did you go from the airport to the movies? A.—By automobile. Q.—In what automobile? A.—In his. Q.—If you went to the movies in his automobile, why did you tell the court and the jury that you had left the airport directly to Arecibo? Explain that. A.—Well, I shall explain to the jury that that was not a matter that would prejudice me because when I told him that the picture was a good one and I wanted to see it and if he could give me an opportunity to see it, he answered in the affirmative. Q.—When I asked you if you had left directly from the airport why did you not tell me that, and told me that you had left right away? A.—From the airport we left immediately for Arecibo but on arriving there, in order to give him time to get other passengers I went into the movies and paid. Q.—Did he go in? A.—Yes, sir, but on condition that he was only to come for me but not to see the picture. Q.—Did he go into the theater? A.—Yes, sir. Q.—At what time? A.— A little after I paid to go in and I sat away from him. Q.—And where did he sit? A.—In the same row but separately. Q.—Did he see the picture with you? A.—He did. Q.—When you left the theater, where did you go? A.—We left. Q.—Did you leave together? A.—Yes, sir.. Q.— Where did you go? A.—We went to Arecibo. Q.—Where was the car parked, in front of the theater? A.—He parked it in front but a little further down. Q.—Did you go to the automobile? A.—Yer, sir. Q.—At what time did you leave the theater? A.—I do not remember. Q.—More or less? A.—I do not remember. Q.—At what time did you go into the movies? A.—When we went in, the picture was already started. Q.— When you say when we went in, who do you mean? A.—When I went in. Q.—Why did you say when we went in? A.—It is a supposition, when I went in. He went in fifteen or twenty minutes later. Q.—What time was that? A.—I do not know at what time the picture began, it was near the end." (Tr. of Ev. pages 17–19)

tried to get down but he did not let her and insisted in having sexual intercourse with her; that he asked her her name and whether she was unmarried (*señorita*) [2] and she refused to tell him; that then he decided to find out by himself by having sexual intercourse with her whereupon she told him that he would have to marrry her because she was unmarried; that the defendant kissed her several times and took hold of her thighs against her will; that she succeeded in getting out of the automobile and he took out a knife and threatened to cut her face if she did not accede to his wishes; that he did not cut her but cut her dress; that she resisted him and he struck her several times with his fist on her chest and on her face; that once when he struck her "she went out of breath" and fell to the ground but she got up and ran and he reached her and tried to lean her against a tree but she resisted him; that then a bus came by and the chauffeur stopped and asked the defendant if there was anything wrong but that he told him to keep on going that there was nothing wrong; that she tried to take a step and get into the bus but the defendant stopped her; that the other chauffeur went on and she said nothing to him; that then it began to rain and he told her to get into the car that he would do her no harm; that she then got into it and left the door open in order to jump out to the road if he again tried to abuse her, but he told her to close it that he would not harm her and they returned to Arecibo to the nurse's house; that when she arrived she tried to pay him but he refused to accept any payment but as he left she called him back and gave him a $5.00 bill which he took giving back the change; that when she reached the hospital before nine o'clock in the evening she spoke to no one nor showed the torn dress to the superintendent; that next morning she called the President of the Chauffeur Union of Arecibo No. 37 and told him of the incident with the defendant;

---

[2] In Puerto Rico the word "señorita" is used in ordinary language as the synonym of "virgin".

that on that same morning she asked Dr. José Sobrino of the hospital to examine her physically so he could certify the injuries; that she told him to examine her, but in order to avoid any misunderstanding she suggested that the district attorney be called and that they should agree on the matter; that she did not present any injuries externally but she had internal injuries caused by the blows.[3]

Dr. José Sobrino testified that at the request of the district attorney he examined Aida Pagán on the morning of June 13 and found that she had pains in the right hypochondrium and in the right cervical region. He found no scratches, bruises, coloration or black and blue marks whatsoever and that she was somewhat nervous.

The testimony of witness Gumersindo García, the chauffeur who took her on June 11 from Arecibo to Vega Alta and that of Felipe García, President of the Chauffeur Union No. 37 of Arecibo shed no light whatsoever on the case so we shall not take time to copy them.

The evidence for the defendant consisted of his own testimony. He testified that after the prosecutrix took his car at the gate of the airport they went to Sopt 15 in order to take other passengers; that when they reached the Stop the prosecutrix saw the announcement of a motion picture which was playing at the Liberty Theater and expressed her desire to see it; that they both went to the theater and that he paid for both tickets; that he asked her if she was single or mar-

---

[3] On being cross examined as to the blows, she testified: "Q.—How many blows did he give you? A.—Many. Q.—About twenty-five? A.— No, sir. Q.—About ten? A.—He gave me many blows. Q.—Did he hit you hard? A.—Exactly, he is a man. Q.—Where did he hit you? A.— On my back, my chest and my abdomen. Q.—Your face? A.—Yes, sir. Q.—Did he hit you with his fist? A.—Yes, sir . . . Q.—This man hit you with his fist like a man may hit a woman, and he did not cause you a black and blue mark? A.—I drank arnic. Q.—When? A.—Next day when I felt the blows and may be the arnic prevented the coloration. Q.—You never had any bruises or ecchymosis? A.—May be internally. Q.—May be you had them but neither you nor the doctor noticed them. A.—No. sir. Q.—They never showed externally? A.—No, sir." (Italics ours.)

ried and she answered that she was divorced and that her ex-husband was in the Army; that then he began to make love to her; that they both left the movies and went to Arecibo with other passengers; that in Vega Alta he offered her a sandwich and a can of pears; that after reaching Arecibo, about seven o'clock in the evening, she told him that she did not have to return to the hospital until nine o'clock; that he continued to ride with her and stopped the car in front of Plaza Café and asked her if she would have a pear juice to which she answered: "It is still too early"; that they continued towards Hatillo until they reached Camuy; that she never asked him to stop the car; that when they reached the crossing known as Maracayo she asked him to return to Arecibo and he turned back; that he then remembered that she had said she was a divorcee and began to make love to her and she told him that if he made love to her he would have to marry her; that when she told him: "Are you going to marry me?" he answered that he really was not sure whether she was unmarried or divorced; that then she told him that he was mistaken about her to which he answered that it must not be true what she told him in the Liberty Theater to the effect that she was divorced and in view of this he took her to the district hospital.

Based on this evidence the jury brought in the verdict stated above.

Since the jury believed the testimony of the prosecutrix, at least, insofar as she testified that the defendant had kissed her and held her thighs without her consent, the verdict is supported by the testimony of the prosecutrix, *People* v. *Díaz,* 62 P.R.R. 477 and we are not justified, therefore, to disturb the discretion of the jury in weighing the evidence.

We shall now examine the instructions to the jury in order to determine whether any fundamental error was committed which in furtherance of justice warrants the reversal of the judgment. From them we have chosen the following:

"1. Now, this defendant states that nothing happened in the road. That he did try to make love to her. He says that she told him that she was married, that she was divorced but that her husband was in the army. Later, on being examined by counsel he states that he did nothing to her because she was a "virgin" (señorita).

"2. So that the defendant has taken the witness stand and has had an opportunity to testify as to any intimate relations that might have taken place between them, but the defendant has said nothing. He has merely denied. He has merely denied what she stated, but has denied it without saying that she encouraged him, without saying that she really looked for him but merely that she invited him for a ride because it was her night off.

"3. He cannot lead the jury now to any suspicion as to her reputation because he has not testified under oath of any act contrary to that reputation. You cannot act on insinuations. You cannot act on mere words. You cannot act on inferences which he had the opportunity to explain but which he did not choose to explain or could not explain. Because the jury must act only on the evidence presented before you.

"4. Gentlemen of the jury, public cars are public carriers which have a license and which are subject to regulations which impose on the chauffeur a strict line of behavior because the public cars as well as the train or any other vehicle on which ladies, children and gentlemen ride, must be trusted by the people and no one has more to gain from preserving this confidence than the chauffeurs themselves, the Chauffeurs' Association, because if that confidence on them should ever be lost, the chauffeurs could not longer earn their living and would have to turn to some other work.

"5. Nowadays in Puerto Rico the woman has many liberties but that is because she is protected by law. A woman goes, as did this lady, to San Juan, trusting that under the Laws of Puerto Rico her honor shall be respected. That is why they go about alone. That is why when you, for example, allow your wife or your daughter to travel in publics cars, you are trusting the integrity of their chauffeurs. You are trusting that the government has granted licenses to those chauffeurs because they are reliable. Furthermore, they have the duty to behave respectfully even towards a loose woman. Because in such a case their duty is to take the passenger without inter-

fering with her. This is not the case of a man who has a car and takes a woman for a ride and makes love to her because he has that car and because he is her friend. That is not the case with them, they are public carriers who are under the obligation to comply with their duty and respect every passenger even if she is a prostitute. A Judge must say these things because of the many incidents that have taken place in Puerto Rico *which must be curbed*.

"6. Gentlemen of the jury, in saying all this, I am not giving an opinion in this case. The judge can not give his opinion in this case. *I have said it in order that you may know the responsibility which you have in this case,* if you should find the defendant guilty beyond reasonable doubt." (Tr. of Ev., pages 51–53.) (Italics ours.)

Attorney A. Reyes Delgado, who represented the defendant at the trial,[4] timely took an exception to these instructions and brought to the judge's attention the errors contained therein.

Instructions marked 1, 2 and 3 tended to discredit the testimony of the defendant. In his testimony he did not merely deny, as was erroneously stated by the court, what the prosecutrix had testified against him. The summary which we have made of his testimony reveals that the defendant explained everything that according to him happened between them on that day from the moment she boarded the car in Vega Alta during the trip to San Juan until, at about nine o'clock in the evening, until he left her in the nurse's house at the District Hospital of Arecibo, where she resided. There were two different versions of the facts and it was incumbent on the jury to weigh and consider them without any prejudice in order to find out the truth. To tell the jury that the defendant had taken the witness stand and "said nothing", to tell the jury that it could not act on insinuations or "mere words", "on inferences which he [the defendant] had the opportunity to explain but which he did not choose to explain or could not explain," is tantamount to instructing

---

[4] Attorney Reyes Delgado did not represent him in this appeal.

the jury to disbelieve defendant's testimony. And the defendant is further wronged when the judge tells the jury in his third instruction that the defendant can not lead the jury to any suspicion as to her reputation "because he has not testified under oath of any act contrary to that reputation." The judge did not bear in mind that the reputation of the prosecutrix was not in controversy and that said instruction besides misleading the jury from the true question before them, constituted an insinuation, unintended of course, to save the prosecutrix's reputation by bringing a verdict against the defendant.

The instructions marked 4, 5 and 6 with respect to the duties of the chauffeurs of public cars towards their passenger were plainly prejudicial to defendant's rights. The question to be determined by the jury was not whether the defendant had failed to comply with his duties as a public carrier. He could have been rude and disrespectful to the passengers and yet not been guilty of the offense charged against him. And defendant's rights are further wronged by the last sentence of the fifth instruction where he says: "A judge must say these things because of the many incidents that have taken place in Puerto Rico *which must be curbed.*" And he emphasizes this point in the sixth instruction when he says: "I have said it in order that *you should know the responsibility which you have in this case ...*" It is true that these last words are followed by the phrase: "if you should find the defendant guilty beyond a reasonable doubt." But these last words cannot cure the harm already done. In view of these instructions the jury must have felt themselves morally bound to bring a verdict against the defendant. It would thus unburden their responsibility by helping to curb the alleged evil on which the judge laid such stress. (Italics ours.)

The analysis which we have made of these instructions leads us to the conclusion that the defendant was deprived of the fair and impartial trial to which he was entitled.

46

We have purposely refrained from commenting on the evidence. We merely summarized it in order that it should speak for itself, for since in our opinion the judgment must be reversed and a new trial granted, we in no way wish to prejudge its result.

The judgment must be reversed and the case remanded to the lower court for a new trial.